**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAMELA MCBRIDE | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 20-4567 |
| CHESTNUT HILL HOSPITAL, LLC, | : | |
| ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.** **SEPTEMBER 30, 2026**

Plaintiff, a former nurse at Chestnut Hill Hospital, alleges that the hospital and two supervisors interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"), and retaliated against her for taking FMLA leave. Plaintiff also brings claims for unpaid wages and retaliation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA"). Defendants seek summary judgment on all claims, arguing that they terminated Plaintiff's employment solely because she abandoned her shift one day in March of 2020, not because she invoked FMLA or FLSA rights. Because there is a need to assess credibility and resolve genuine disputes of material fact, the motion for summary judgment will be denied.

## I. BACKGROUND

Plaintiff Pamela McBride worked as a nurse in the operating rooms ("OR") at Chestnut Hill Hospital ("CHH"). She started in 2015 and had positive performance reviews through 2018. (Pl. Ex. B at PHM 000103-121, ECF No. 18-3 at 11-34.)[1]

Before arriving at work in the mornings, Plaintiff cared for her son with autism. (Pl. Decl. ¶ 3, Pl. Ex. A, ECF No. 18-3 at 3-10; Pl. Dep. at 64:17-65:16, Def. Ex. 1, ECF No. 17-5 at 1-85.) Due to Plaintiff's son's needs, it sometimes took extra time to get him ready for school. (Pl. Decl. ¶ 3; Pl. Dep. at 86:18-89:2, 123:7-124:23.) For example, he might need "to change his shirt multiple times or take socks off that are itchy or wash his hands repeatedly[.]" (Pl. Decl. ¶ 3; Pl. Dep. at 123:7-124:23.) These delays sometimes caused Plaintiff to arrive late for work, usually by a few minutes. (Pl. Decl. ¶ 3; Pl. Dep. at 86:18-89:2, 123:7-124:23.) Defendants were aware of Plaintiff's son's needs and Plaintiff's responsibilities in the morning. (Pl. Decl. ¶¶ 4-7.)

In October 2018, CHH hired Defendant Sudesh Joshi-Chhibbar ("Chhibbar") as Director of Surgical Services, and Plaintiff began reporting to Chhibbar. (Def. Statement of Undisputed Material Facts ("Def. SMF") ¶ 10, ECF No. 17-3; Pl. Counterstatement of Facts ("Pl. CSMF") ¶ 8, ECF No. 18.) Shortly after Plaintiff began reporting to Chhibbar, Plaintiff's arrival time became a subject of dispute. Much of the dispute centered on the 7:00 a.m. "morning huddle," a daily meeting to discuss the day's procedures that CHH's Surgical Services Department instituted in the

---

[1] The factual background is derived from the parties' summary judgment submissions, including the exhibits attached thereto. We view the facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiffs as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

For ease of reference, initial citations to record documents and depositions identify the alphabetic or numerical exhibit reference, the pinpoint citation to the exhibit's internal pagination or paragraph numbering, the ECF document number containing the exhibit, and the page range of the full exhibit using ECF pagination.

fall of 2018. (Pl. Decl. ¶¶ 11-21; Pl. CSMF ¶¶ 9-11; Def. SMF ¶¶ 28-30, 54-59.) Nurses, including Plaintiff, needed to be at the huddle by 7:00 a.m., dressed in surgical scrubs. (Pl. CSMF ¶¶ 9, 26; Def. SMF ¶ 28.)

One morning in October of 2018, Plaintiff was reprimanded for arriving a few minutes late to the morning huddle. (Pl. Dep. at 62:22-65:20; Pl. Decl. ¶¶ 13-17.) Plaintiff complained to her then-supervisor, Cyndy Wilson, that the 7:00 a.m. huddle required her to arrive at work and change into scrubs prior to the time for which she was compensated. (Pl. Decl. ¶¶ 13-17; Pl. Dep. at 62:22-65:20.) Wilson spoke with Orlando Castro, CHH's Director of Human Resources, and advised Plaintiff that CHH would not pay for changing time and that she could not clock in more than seven minutes before her shift. (Pl. Decl. ¶¶ 13-17; Pl. Dep. at 65:10-20.)

Castro's statement is in line with CHH's written policies. Pursuant to Defendants' Attendance Policy, employees could not clock in more than seven minutes prior to their shift and could not clock out more than seven minutes after their shift. (Def. Ex. 10 at PHM 000284-285, ECF No. 17-5 at 276-367; Pl. Dep. at 49:22-51:1.) In addition, CHH's timekeeping system automatically rounded clock-in and clock-out times to the nearest quarter of an hour. (Def. Ex. 3, Dougherty Dep. at 54:22-57:11, ECF No. 17-5 at 117-172.) If Plaintiff's shift started at 7:00 a.m., the earliest she could clock in was 6:53 a.m. (Defs.' Ex. 10 at PHM 000284-285, ECF No. 17-5 at 483-86; Pl. Dep. at 49:22-51:1.) However, because of the way CHH's rounding system works, even if Plaintiff clocked in at 6:53 a.m. to change into scrubs and attend the morning huddle on time, the system would round her start time to 7:00 a.m. for purposes of her compensation. (Dougherty Dep. at 54:22-57:11.)

Around the same time, Plaintiff invoked her right to intermittent FMLA leave to assist her son in the mornings and arrive a bit late to work. Intermittent FMLA leave allows an individual to work part of the day as opposed to taking the entire day or week as protected leave. 29 U.S.C. §§ 2611(9), 2612(b)(1). Plaintiff used intermittent FMLA leave from October of 2018 through the end of her time at CHH. (Def. SMF ¶¶ 48-50.)

Shortly after Plaintiff first used FMLA leave, Castro, Wilson, and Chhibbar met with Plaintiff and discussed her use of FMLA. Castro told Plaintiff that she was not allowed to use FMLA "to be tardy." (Pl. Dep. at 127:23-128:1.) Chhibbar made similar comments regarding Plaintiff's use of FMLA to care for her son in the mornings, including one episode in which, according to Plaintiff, Chhibbar screamed at Plaintiff in the locker room in front of another employee about how Plaintiff could not use FMLA to be "late" for work. (Pl. Decl. ¶ 25; Pl. Dep. at 222:6-15.)

Problems related to Plaintiff's use of FMLA persisted until the culminating events that gave rise to this lawsuit. In addition to telling Plaintiff she could not use FMLA to be late for work, Chhibbar also critiqued Plaintiff for various supposed infractions without a basis in any CHH policy. (Pl. Decl. ¶¶ 25-26.) For example, Chhibbar criticized Plaintiff for her nail polish, the location of her locker, and where she clocked in. (Pl. Decl. ¶¶ 25-26; Pl. Dep. at 98:14-101:4, 104:13-21.) Plaintiff testified that Chhibbar also imposed a policy that required Plaintiff to provide 45 minutes advance notice whenever she would need to use FMLA leave in the morning, even though a 45-minute advance notice requirement did not appear in CHH's written attendance policy. (Pl. Dep. at 86:4-17, 141:3-142:5.) Plaintiff attributes these comments to Defendants'

frustrations with her use of FMLA leave and her comments about unpaid changing time in violation of the FLSA. (Pl. Decl. ¶¶ 24-26; Pl. Dep. at 104:13-21.)

In addition, Plaintiff received "attendance points" based on her arrival time. These points were assessed through Defendants' automated timekeeping system, Kronos, and correlated with escalating levels of warnings and potential discipline. (Defs.' Ex. 10 at PHM 000285-286.) Although there is some dispute as to the parties' respective obligations to properly record FMLA leave, record evidence supports Plaintiff's assertion that she received attendance points that she should not have received. (Pl. Decl. ¶¶ 28-31; Pl. Dep. at 128:18-129:6; Def. Ex. 4, Chhibbar Dep. at 59:18-25, ECF No. 17-5 at 173-275; Dougherty Dep. at 41:6-22; *see also* Def. Ex. 5, Castro Dep. at 69:22-70:16, ECF No. 17-5 at 276-367 ("I believe most of the points are to be removed, as [Plaintiff] is covered under Protected Time."). Plaintiff had to ask Chhibbar to remove these improperly assessed attendance points. (Pl. Decl. ¶ 29; Pl. Dep. at 128:18-129:6.) Chhibbar was often slow to do so. (*Id.*) Plaintiff also received "Attendance Action Alerts" that threatened Plaintiff with discipline, despite being based on inaccurate point tallies. (Pl. Decl. ¶¶ 27-30; Defs.' Ex. 26 at PHM000196-197, ECF No 17-5 at 574-576.)

Plaintiff made several complaints related to her FMLA and FLSA rights. (Pl. Decl. ¶ 37; Pl. Dep. at 142:11-23; Pl.'s Ex. I at Plaintiff 0001-0005, 0085-0090, ECF No. 18-4 at 10-22.) In one instance, Plaintiff filed a written complaint regarding her use of FMLA and Chhibbar's harassment. (Pl. Decl. ¶ 37; Pl. Dep. at 142:11-23.) Plaintiff also complained about these issues via the Employee Hotline for abusive behaviors. (Pl. Decl. ¶ 37; Pl. Dep. at 142:11-23.)

On March 4, 2020, Plaintiff reported to work but soon became ill. Plaintiff informed her supervisor, Defendant Maryann Dougherty, that she was unable to continue working and needed

to seek medical care. (Pl. Dep. at 190:21-191:6, 200:19-201:22; Pl. CSMF ¶¶ 58-60.) Dougherty responded that she "would be unable to run three ORs," but she instructed Plaintiff to go either to urgent care or her "primary." (Pl. Decl. ¶ 39; Pl. Dep. at 190:21-191:6, 200:19-201:22.) Defendants dispute Plaintiff's version of what was said between Plaintiff and Dougherty. (Def. SMF ¶¶ 86-89, 98-101.)

Plaintiff first sought care from CHH's Employee Health Nurse, but she was unavailable. (Pl. Decl. ¶ 41; Pl. Dep. at 189:17-191:1.) Plaintiff went home and slept. (Pl. Dep. at 191:18-192:16.) The next day, she went to urgent care and was diagnosed with the flu. (*Id.*) Plaintiff returned to work on March 17 and submitted her doctor's note that supported her absence from March 5 through the March 13. (Pl. Decl. ¶ 45; Pl. Dep. at 210:22-211:1.) Chhibbar instructed Plaintiff to clock out, go home, and write up a statement about the events of March 4—the day Plaintiff told Dougherty she was sick and left the hospital early. (Def. SMF ¶ 109; Pl. CSMF ¶ 72.)

Defendants eventually decided to terminate Plaintiff's employment, and there is some indication that they reached this conclusion prior to finishing their review of Plaintiff's actions on March 4 or obtaining a statement from Plaintiff. (Pl. Ex. N at PHM 000244-245, ECF No. 18-5 at 5-28.) Although the termination document is dated March 17, 2020, Chhibbar did not sign the document until June 2, 2020, and Plaintiff did not receive the document until June 3, 2020. (Pl. Decl. ¶¶ 49-52; Pl. Ex. P at Plaintiff 0148-0149, ECF No. 18-5 at 33-35.)

According to Defendants' attendance policy, an employee who missed her shift without approval would receive 3 attendance points. (Defs.' Ex. 10 at PHM 000285.) An employee who accrued 18 points in a rolling 9-month period would be terminated under the policy. (*Id.* at PHM

000285-86.) At no time did Plaintiff have 18 attendance points, even assuming she left her shift without permission on March 4, 2020. (Pl. Decl. ¶ 53; Pl. Ex. N at PHM 000243.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). When the non-moving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1). At summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Summary judgment is inappropriate when a case depends on credibility determinations or requires a court to resolve a genuine, material factual dispute. *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. DISCUSSION

This case involves two statutes, the FMLA and the FLSA, both designed to protect workers. Congress passed the FMLA in 1993 and stated that its purpose was "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families,

and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1). The FMLA allows eligible employees to take twelve weeks of leave per year due to personal health needs or to care for a family member. *Id.* § 2612(a)(1)(C). It also prohibits employers from interfering with an employee's rights under the statute and from retaliating against an employee for exercising those rights. *See Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005) (noting that 29 U.S.C. § 2615(a)(1) is the "interference" provision of the FMLA, and § 2615(a)(2) is the "retaliation" provision).

The FLSA, enacted in 1938, established minimum wage, maximum hours, and overtime pay requirements for covered employers and employees. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005). "Among the bedrock principles of the FLSA is the requirement that employers pay employees for all hours worked." *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 330 (3d Cir. 2016). The FLSA also provides that an employer may not discharge an employee because the employee has made a complaint related to the FLSA, whether formal or informal. 29 U.S.C. § 215(a)(3); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011). In addition, "'the FLSA must be construed liberally in favor of employees' and 'exemptions should be construed narrowly, that is, against the employer.'" *Smiley*, 839 F.3d at 329 (quoting *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008)).

Because the central event that gave rise to this case was the termination of Plaintiff's employment, we will first address Plaintiff's retaliation claims under both statutes. We will then address Plaintiff's FMLA interference claim, followed by Plaintiff's FLSA unpaid wages claim.

**A. FMLA Retaliation**

The FMLA prohibits an employer from retaliating against an employee for invoking her

right to FMLA leave. *Lichtenstein*, 601 F.3d at 301-302; *see also* 29 C.F.R. § 825.220(c). To establish a *prima facie* case of FMLA retaliation, a plaintiff must show that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein*, 601 F.3d at 302. If the plaintiff establishes those elements, the employer must articulate a legitimate, nonretaliatory reason for the adverse action. *See Capps v. Mondelez Global, LLC*, 847 F.3d 144, 152 (3d Cir. 2017) (noting FMLA retaliation claims are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and applying that framework). If the employer provides a legitimate reason for the adverse action, the plaintiff must then identify evidence from which a reasonable factfinder could conclude that the employer's proffered reason was pretextual. *Id.*

Defendants dispute only the causation element of McBride's *prima facie* case. (Defs.' Br. at 19, ECF No. 17-2.) Defendants argue that the sole reason for Plaintiff's termination was that she left the hospital mid-shift on March 4, 2020, without authorization, and that Plaintiff cannot show that CHH's explanation is pretext for retaliation based on Plaintiff's use of FMLA leave. (*Id.* at 21, 24-25, 32.)

Plaintiff relies on *Egan v. Delaware River Port Auth.* to establish causation. 851 F.3d 263 (3d Cir. 2017). In *Egan*, the Third Circuit deferred to the Department of Labor's interpretation of the FMLA and held that a plaintiff may "rely on [a mixed-motive] theory so long as the evidence, whether direct or circumstantial, permits a reasonable juror to conclude that the plaintiff's use of FMLA leave was a negative factor in the employer's adverse employment decision." *Egan*, 851 F.3d at 269.

A plaintiff may establish causation through unusually suggestive temporal proximity, a pattern of antagonism, inconsistencies in the employer's explanation, or other evidence that, considered as a whole, supports an "inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232–33 (3d Cir. 2007); *Lichtenstein*, 691 F.3d at 307. Temporal proximity and a pattern of antagonism are not exclusive methods of establishing causation; the Court must consider the record in its entirety. *LeBoon*, 503 F.3d at 232.

In this case, and viewed in favor of Plaintiff, the record permits an inference that Plaintiff's use of FMLA leave was casually connected to her termination. A reasonable factfinder could conclude that Defendants considered Plaintiff's use of FMLA leave as a negative factor in their decision to terminate her employment. For example, Plaintiff has alleged several instances of antagonism and has shown that Defendants' articulated reason for her termination is not supported by their own attendance points system. The comments from Chhibbar and Castro that Plaintiff could not use FMLA leave to be late in the morning due to her son's needs—including Chhibbar screaming the same at Plaintiff in front of another employee—and Chhibbar's ongoing negative comments toward Plaintiff could lead a reasonable factfinder to find a causal link between Plaintiff's use of FMLA and Defendants' decision to terminate her employment. Plaintiff has established a *prima facie* case of retaliation.

In addition, Plaintiff has produced sufficient evidence from which a factfinder could conclude that Defendants' proffered reason for her termination—that Plaintiff abandoned a single shift when she was ill—was pretextual. Viewed in Plaintiff's favor, the record suggests a troubling pattern of antagonism directed toward Plaintiff related to her use of FMLA leave. A reasonable factfinder could also view Defendants' treatment of Plaintiff's shift abandonment as inconsistent

with CHH's own written attendance policy. Thus, there is evidence from which a jury could disbelieve Defendants' proffered explanation for Plaintiff's termination. At this stage in the case, that is sufficient to defeat summary judgment. *See, e.g.*, *Beird v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, 487 F. Supp. 3d 270, 279 (E.D. Pa. 2020) (denying summary judgment where genuine issues of material fact existed regarding whether employer's proffered reasons for termination were pretextual.)

**B. FLSA Retaliation**

Defendants again dispute a causal relationship between Plaintiff's invocation of her rights and Defendants' decision to terminate her employment. (Def. Br. at 18-19.); *see* *Preobrazhenskaya v. Mery Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003) (listing the elements of an FLSA discriminatory retaliation claim). Defendants also assert that Plaintiff cannot meet her burden under the *McDonnell Douglas* burden-shifting framework for FLSA retaliation claims. *Cononie v. Allegheny Gen. Hosp.*, 29 F. App'x 94, 95 (3d Cir. 2002).

Defendants contend that Plaintiff's only FLSA-protected activity was her complaint about changing time in the Fall of 2018. (Def. Br. at 19-20.) Defendants assert that there can be no causal connection between Plaintiff's complaint and her termination in March 2020 because the two events are not close in time. Defendants also claim that there was no "ongoing antagonism" due to Plaintiff's FLSA-related complaint in 2018.

The Court agrees that the temporal gap between Plaintiff's FLSA complaint and her termination cuts against Plaintiff's causation argument. However, Plaintiff need not show temporal proximity to establish causation. *See, e.g., Leboon*, 503 F.3d at 232-33. In addition, Defendants' argument ignores the ongoing antagonism supported by the record. Taking the facts

in the light most favorable to Plaintiff, as we must, Plaintiff's objection to the 7:00 am huddle and the related uncompensated changing time requirement was an ongoing subject of conversation and tension. Moreover, Plaintiff testified that Defendants made numerous negative comments to her in response to her FLSA complaints. Plaintiff has demonstrated enough ongoing antagonism to establish the causation prong for *a prima facie* case of FLSA retaliation.

Because Defendants have proffered a legitimate reason for the plaintiff's termination—a single instance of alleged shift abandonment on March 4, 2020—Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To discredit Defendants' stated reason, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence[.]" *Id.* at 765 (internal quotation omitted).

Defendants cite a non-precedential Third Circuit decision for the proposition that Plaintiff cannot discredit Defendants' explanation because Plaintiff's subjective view of whether she had permission to leave on March 4, 2020, is irrelevant. *Mimi Ma v. Westinghouse Elec. Co., LLC*, 559 F. App'x 165 (3d Cir. 2014). This argument is not convincing. Unlike in *Ma*, and as recited above, there is more to Plaintiff's case than self-serving statements about the quality of her job performance. And a reasonable jury could disbelieve Defendants' proffered explanation even if it finds that Plaintiff did not have permission to leave her shift on March 4, as Defendants' attendance

points system contemplates that an employee could abandon her shift without losing her job. For the reasons discussed above, Plaintiff has put forward enough evidence for a reasonable factfinder to conclude that Defendants' explanation of a single instance of shift abandonment is pretext for termination causally connected to Plaintiff's FLSA complaints.

### C. FMLA Interference

Defendants argue that they never denied Plaintiff any FMLA benefit to which she was entitled. (Def. Br. at 5); *see also Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014) (stating the five elements of a claim for FMLA interference, including that a plaintiff was denied a benefit to which she was entitled). However, FMLA interference encompasses more than outright denials of FMLA benefits. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 142 (3d Cir. 2004) (quoting 29 C.F.R. § 825.220(b)) ("'Interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

Plaintiff alleges several instances when Defendants discouraged her use of FMLA leave. For example, a reasonable factfinder could find that Defendants discouraged Plaintiff's use of FMLA leave when they issued attendance points for times when Plaintiff validly used leave and when Defendants told Plaintiff that she could not use FMLA leave "to be tardy." A factfinder could also conclude that Defendants interfered with Plaintiff's FMLA rights if they find that Defendants terminated Plaintiff's employment in retaliation for her use of FMLA leave. *See Erdman v. Nationwide Ins. Co.,* 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.").

Defendants state that Plaintiff's alleged instances of FMLA interference—the attendance points and the negative comments—do not amount to interference because Plaintiff cannot establish prejudice and because she was late to report her approved leave "a number of times." (Def. Br. at 6-9.) But Defendants' arguments require factual findings and credibility assessments that are inappropriate at summary judgment. A jury can decide whether these comments discouraged Plaintiff from using FMLA leave or otherwise interfered with Plaintiff's rights. A jury can also weigh the number of times Plaintiff was improperly assessed attendance points versus the times she was late to enter her approved leave and determine whether these instances amount to interference, as Defendants do not claim that all improperly issued attendance points were the result of Plaintiff's late entry. In addition, Defendants' reliance on an automated system that assessed the points—a system they chose to use—to distance themselves from Plaintiff's interference claim is unconvincing. (Def. Br. at 5.) Defendants have not cited a case that supports such a frustration of the FMLA's protections. Understandably so, because Defendants' argument would render the FMLA's protections against interference meaningless whenever an employer used an automated system. An employer cannot avoid liability for FMLA interference by virtue of allowing an automated system to commit the interference instead of directly interfering itself.

**D. FLSA Unpaid Wages**

Plaintiff's unpaid wages claim is based on the requirement to attend the morning huddle in scrubs at 7 a.m., effectively forcing her to change into scrubs prior to the time for which she was compensated. This claim is often referred to as a "donning and doffing" claim. Defendants make four arguments in support of their asserted entitlement to summary judgment on Plaintiff's unpaid wages claim.

First, Defendants contend that Plaintiff never measured the amount of time it took her to change into scrubs in the morning and, thus, so she has no evidence that she performed work "off the clock." (Def. Br. at 10.) This argument misunderstands the evidentiary burden. Although an employee must prove that she performed work for which she was not compensated, she "easily discharges this burden by securing the production of th[e] records" that an employer is required to keep related to the FLSA. *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014) (quoting 29 U.S.C. § 211(c)). Defendants' records would show when Plaintiff clocked in prior to her shift to change into scrubs, so the amount of "off the clock" time is easily ascertainable. If Defendants did not maintain the records as required, then Plaintiff can provide evidence from which a jury could reasonably infer the amount of unpaid changing time. *Id.* (quoting *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946)). At her deposition, Plaintiff estimated that it took her ten to fifteen minutes to change into scrubs, depending on the time of year. (Pl. Dep. at 59:9-15.)

Defendants next argue that because Plaintiff's Complaint alleges that Defendants retaliated against her for changing into scrubs "on the clock," Plaintiff has no proof that she performed any work "off the clock" for which she was not compensated. While there is evidence that Plaintiff sometimes changed into scrubs after clocking in for her regular shift, that does not establish that she always did so. In her deposition, Plaintiff made references to clocking in prior to 7 a.m. (Pl. Dep. at 64:17-65:24, 72:15-73:5.) In addition, the time records submitted by Defendants indicate that there were several days on which Plaintiff clocked in prior to 7 a.m. (Def. Ex. 6, Ex. A at PHM 001165-1213, ECF No. 17-5 at 374-424.) These records support Plaintiff's allegation of uncompensated time spent changing into scrubs.

Defendants then devote the bulk of their argument to their own policies and timekeeping

practices, arguing that their purportedly "neutral" rounding system precludes Plaintiff from stating a claim for unpaid wages. (Def. Br. at 11.) In defense of their rounding system, Defendants rely on *Corbin v. Time Warner*, in which the Ninth Circuit affirmed the Department of Labor's interpretation that a rounding system is permissible under the FLSA, "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 821 F.3d 1069, 1075-78 (9th Cir. 2016) (quoting 29 C.F.R. § 785.48(b)). *Corbin*, however, was not about an employer's failure to compensate for donning and doffing time. *Id*. It addressed the validity of the employer's rounding system in terms of an employee's aggregate compensation for his regularly scheduled shifts. *Id*. And, in contrast to this case, nothing in *Corbin* suggests that the employer had a policy restricting the amount of time an employee could record before or after a shift. *Id.* at 1078 ("Third, [the employer's] rounding policy allows employees to gain overtime compensation just as easily as it causes them to lose it. For example, an employee who clocks in for eight hours and eight minutes of work in a day, will see those eight minutes rounded up to fifteen minutes—all of which will be compensated at the overtime rate.").

Here, the general propriety of a rounding system is not what is at issue. Indeed, a reasonable factfinder could conclude that the presumption that underpins the DOL's and *Corbin's* approval of rounding systems is not applicable to CHH's system because CHH prohibited employees from ever recording more than seven minutes before or after a scheduled shift. This policy guaranteed that an employee's time would never be rounded up, as that would not occur until an employee recorded a time at least eight minutes before or after a scheduled shift.

For the same reasons, a reasonable factfinder could also conclude that Defendants' policies

necessarily required Plaintiff to perform work for which she was not compensated. Defendants did not permit employees to clock in more than seven minutes prior to a scheduled shift. On a normal day, that meant Plaintiff could not clock in prior to 6:53 am. But under Defendants' rounding policy, any clock-in time from 6:53 am to 7:00 am would be credited as 7:00 am for purposes of calculating compensation. Although the parties contest the amount of time it takes to change into scrubs, there is no disputes that it takes some amount of time. Defendants' requirement that Plaintiff attend a 7:00 am meeting in scrubs, coupled with its policy prohibiting Plaintiff from clocking in prior to 6:53 am, necessarily means that Plaintiff could not be paid for time spent changing into scrubs and arrive at the required meeting on time.

Lastly, Defendants make what other courts have called an "offsetting" argument, asserting that Plaintiff was over-compensated compared to the time she actually worked. (Def. Br. at 15.) In support, they offer the Declaration from Rebecca Fuertsch, a time and attendance analyst, the propriety of which is the subject of some dispute. (Fuertsch Decl. , Defs.' Ex. 6, ECF No. 17-5 at 368-373.) Even if we consider the Fuertsch Declaration, it does not resolve the issue in favor of Defendants.

Defendants use Fuertsch's calculations to argue that because their rounding system resulted in Plaintiff being paid for 418 additional minutes as compared to her actual clock-in and clock-out times, Defendants do not owe Plaintiff any compensation for time she might have worked outside of her scheduled hours. (Def. Br. at 15.) However, the alleged "overpayments" are a function of Defendants' rounding system. For example, if Plaintiff clocked in at 7:07 a.m. and clocked out at 7:00 p.m., she would receive credit for twelve hours of work, even though she was at work for 11 hours and 53 minutes. Defendants do not point to any case law suggesting that a rounding system

that happens to inure to an employee's benefit for time worked *during* her shift absolves the employer of paying the employee for time she worked *outside* her scheduled shift.

The Third Circuit has considered similar arguments from employers and held that this type of "offsetting" is not permitted under the FLSA. *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 333 (3d Cir. 2016) ("In essence, at the point at which compensation is included in the regular rate (regardless of whether the Act required it be included), an employer may not use that compensation to offset other compensation owed under the Act."); *Wheeler v. Hampton Twp.*, 399 F.3d 238, 245 (3d Cir. 2005) (stating that "[w]here a credit is allowed, the statute says so," and explaining that the FLSA does not allow an employer to use "non-work pay" at "a non-premium rate" to offset other payments due under the FLSA). In *Smiley*, the Third Circuit rejected the employer's attempt to use paid break time to offset compensation owed for donning and doffing, even when "[t]he paid break time always exceeded the amount of time Plaintiffs spent donning and doffing and [performing other work outside their shift]." *Smiley*, 839 F.3d at 328. The principle in *Wheeler* and *Smiley* is that an employer cannot avoid its responsibilities under the FLSA to pay for work an employee does outside of her shift by relying on compensation it agreed to pay the employee at her regular rate. Just as the employers in *Smiley* and *Wheeler* attempted to use "non-work" compensation in the form of paid lunch and vacation, respectively, to offset their obligations under other provisions of the FLSA, Defendants here seek to use compensation for "non-work" time that is the result of its rounding system to offset any obligations to pay Plaintiff for donning and doffing protective gear. In the Court's view, Defendants' argument is foreclosed by *Wheeler* and *Smiley*.

The fact that CHH's rounding system might have worked to Plaintiff's advantage when

she clocked in after 7 a.m. but before 7:08 a.m. does not change the analysis of whether Plaintiff was entitled to compensation for changing into surgical scrubs prior to the start of her shift. The question that Plaintiff's Complaint raises, and which the Fuertsch Declaration does not answer, is whether Plaintiff was entitled to and denied compensation for donning and doffing protective gear *outside* of her scheduled shift. The proper analysis for Plaintiff's donning and doffing claim is whether changing into scrubs prior to the start of her shift was an integral and indispensable part of the principal activity for which she was employed. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 30, 37 (2005). Plaintiff asserts that it was, and Defendants do not argue otherwise. The next question is whether Plaintiff was compensated for this time. As explained above, she was told that she would not be, and Defendants' system combined with its policies meant that she could not be. A reasonable factfinder could find in favor of Plaintiff on her FLSA unpaid wages claim.

## IV. CONCLUSION

For the foregoing reasons, we will deny Defendants' motion for summary judgment on all claims.

**BY THE COURT:**

*/s/ R. Barclay Surrick*

**R. BARCLAY SURRICK, J.**